IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JANE ROE,                          )
      Plaintiff,                   )
                             )
             v.                      )          Civil Action No. 3:24CV145 (RCY)
                             )
TYKESHAE FOWLKES TUCKER, *et al*,  )
      Defendants.                  )
_____ )

**MEMORANDUM OPINION**

This is a 42 U.S.C. § 1983 action wherein Plaintiff alleges that Defendant Nkemdilim Okoli, a former correctional officer, sexually assaulted Plaintiff while she was in the custody of the Virginia Department of Corrections.  Plaintiff brought this action against Defendant Okoli as well as Defendant Tykeshae Fowlkes Tucker, who was the Superintendent of the facility that housed Plaintiff at the time of the assault.  The case is presently before the Court on Defendant Fowlkes's Motion for Summary Judgment.  For the reasons stated below, the Court will grant the Motion.

## I. BACKGROUND

In reviewing a motion for summary judgment, the Court exercises great care to resolve any factual disputes and "competing, rational inferences" in the light most favorable to the opposing party.  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).  Under the Local Rules, the Court may accept those facts identified by the movant as undisputed to be admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion and supported by reference to record evidence.  E.D. Va. Loc. Civ. R. 56(B).  After review of the parties' briefs and the exhibits provided in support thereof, *see generally* Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem. Supp."), ECF No. 36; Mem. Supp.

Pl.'s Resp. Opp'n Def.'s Mot Mem. Summ. J. ("Pl.'s Opp'n"), ECF No. 46, the Court has concluded that the following narrative represents the undisputed facts for the purpose of resolving the instant Motion.

## A. Factual Background

### 1. Overview of Underlying Allegations

Plaintiff Jane Roe is an incarcerated woman who is currently housed by the Virginia Department of Corrections ("VDOC"). *See, e.g.*, Def.'s Stmt. Undisp. Facts ("Def.'s SUF") ¶ 1, ECF No. 36. In 2018, Plaintiff was transferred to the unit where both Defendants were, at the time, employed: Central Virginia Correctional Unit #13 ("CVCU"). *Id.* ¶¶ 1–2, 7; Roe Aff. 1, ECF No. 46-1. CVCU is classified as a women's correctional field unit within VDOC, and, as of February of 2023, housed a total of 112 inmates. Pl.'s Opp'n Ex. 4, ECF No. 46-4 (VDOC Population Summary); Fowlkes Aff. Ex. I at 6, ECF No. 36-1 at 150–176.

On December 19, 2020, Plaintiff was sexually assaulted by Defendant Okoli, when Okoli followed Plaintiff "into the showers, blocked her exit, pinned her against the shower door, and aggressive groped her breasts and buttocks. He then lowered his face mask and kissed Plaintiff on the mouth." *Roe v. Tucker*, 2025 WL 41932 (E.D. Va. Jan. 7, 2025); Def.'s SUF ¶ 4 (citing Compl. ¶ 23, ECF No. 1); Roe Aff. 3–4. Plaintiff immediately told two other inmates about the assault. Roe Aff. 3–4. However, in the months following the assault, Plaintiff experienced "extreme depressive and anxious symptoms" due to the psychological trauma of the assault, and was placed on suicide watch. *Id.* at 4. As a result, of her psychological symptoms, Plaintiff did not report Okoli's assault to CVCU staff until May of 2021. *Id.* However, Plaintiff's May report—made to a CVCU correctional officer named Officer Ross—was mishandled and never relayed to the CVCU Superintendent's Office. Def.'s SUF ¶ 14; Roe Aff. 4–5.

2.  Defendant Okoli's Tenure at CVCU

Defendant Okoli began his employment with VDOC in 2012 at Sussex State Prison.  Def.'s SUF ¶ 5; Fowlkes Aff. ¶ 8, ECF No. 36-1; Fowlkes Aff. Ex. A at 2, ECF No. 36-1 at 13–25.  From 2012 to 2020, Okoli received a single infraction for taking unapproved leave.  Def.'s SUF ¶ 8.  Okoli had no history of "reprimands or disciplinary actions related to inappropriate conduct or fraternization with inmates."  *Id.*  Upon his hire in 2012, Okoli completed Prison Rape Elimination Act ("PREA") mandated training,[1] which instructed employees as to the "offender's right to be free from sexual abuse and sexual harassment," as well as VDOC's "Zero Tolerance Policy for sexual abuse and sexual harassment."[2]  *Id.* ¶ 32; Fowlkes Aff. Ex. D at 2, ECF No. 36-1 at 47–51.  Following this initial training, Okoli passed a PREA "in-service staff exam with a score of 95 out of 100."  Def.'s SUF ¶ 32.  Okoli completed additional PREA trainings each following year, each accompanied by a PREA in-service exam.  *Id.* ¶ 33.  Okoli passed each exam with a perfect score.  *Id.*

Okoli applied for a position at CVCU in May of 2020.  Def.'s SUF ¶ 6.  At the time that Okoli applied to work at CVCU, the CVCU employment application prompted applicants to disclose if they had ever (1) "engaged in sexual abuse in an institutional setting"; (2) "been convicted of engaging or attempting to engage in sexual activity . . . facilitated by force . . . or

---

[1] The statutory component of PREA is a Congressional mandate to the Department of Justice ("DOJ") and Department of Homeland Security ("DHS") to promulgate regulations governing the detection, prevention, reduction, and punishment of prison rape.  Gabriel Arkles, *Prison Rape Elimination Act Litigation and the Perpetuation of Sexual Harm*, 17 N.Y.U. J. Legis. & Pub. Pol'y 801, 803 (2014) (citing 34 U.S.C. § 30307).  The DOJ promulgated its PREA regulations in 2012, which directly bind the Federal Bureau of Prisons.  *Id.* (citing 28 C.F.R. §§ 115 *et seq.*).  State prisons, however, are free to adopt or reject the requirements of the DOJ standards.  *Id.*; *J.K.J v. Polk County*, 960 F.3d 367, 385 (7th Cir. 2020).  For the purpose of this Memorandum Opinion, "PREA" refers to VDOC's particular adoption of the federal PREA standards, particularly as they relate to the prohibition on fraternization between prison officials and inmates as well as the mandate that prison officials report any suspected or actual sexual assault.  *See, e.g.*, Fowlkes Aff. Ex. E at 2, ECF No. 36-1 at 52–73 (explaining VDOC's adoption of PREA).

[2] Specifically, the training "repeatedly notes that any behavior of a sexual nature between employees and inmates is prohibited," as well the fact that "inmates can never consent to a sexual relationship with staff members, and that it is a felony for a VDOC employee to engage in sexual relationships with an inmate."  Def.'s SUF ¶ 34.

[where] the victim did not consent or was unable to consent or refuse"; or (3) "been civilly or administratively adjudicated for having engaged in the sexual activity" described in the previous question. Fowlkes Aff. Ex. A at 12. Okoli responded "no" to each prompt. *Id.* Okoli was hired, and began working at the CVCU facility on July 10, 2020. Def.'s SUF ¶ 7.

Okoli underwent a performance review for his work at CVCU in October of 2020. Def.'s SUF ¶ 10. Okoli's review was positive. *Id.* Per VDOC policy, following the review, Okoli was again asked to verify whether he had ever committed or been adjudicated of the sexual abuses enumerated in his employment application. *Id.* Okoli confirmed that he had not. *Id.*; Fowlkes Aff. Ex. B at 2, ECF No. 36-1 at 26–27.

Of course, Plaintiff's allegations paint a very different picture of Okoli—and the undisputed facts demonstrate that her story is not the only one of its kind amongst CVCU inmates. In June of 2021, other inmates lodged anonymous complaints against Okoli, which led to an institutional investigation against him. Def.'s SUF ¶ 11; Roe Aff. 4–5. That investigation revealed at least five inmates apart from Plaintiff who had experienced sexual harassment and physical abuse by Okoli, ranging from sexual comments to rape. *See generally* Mem. Opp'n Ex. 3, ECF No. 46-3 [hereinafter SIU Report]. Aside from Okoli's attack on Plaintiff in December of 2020, Okoli was accused of abuses occurring from February to June of 2021, although several inmates could not provide an approximate date of their encounters. Def.'s SUF ¶ 12; SIU Report 2–6. The investigation revealed that Okoli's assaults on inmates largely occurred in locations known to be surveillance camera blind spots, such as the hallway outside the laundry room.[3] *E.g.*, SIU Report 2.

---

[3] Plaintiff argues that Okoli's attack in the showers and the assaults in the hallway outside the laundry room were only part of a pattern of "correctional officers exploiting the camera blind spots" to commit sexual abuses upon inmates. Roe Aff. 5–6. Specifically, Plaintiff asserts that she is aware of at least one other instance in an officer reportedly assaulted an inmate in the freezer, where there are no cameras. Roe Aff. 6. Inmates would also take

Even before Roe's assault, however, Okoli had earned a reputation amongst inmates for sexually predatory behavior, which garnered him a nickname: Sergeant "Rapes-a-lot." Roe Aff. 2. In fact, Okoli prior to making physical conduct with Roe on the date of her assault, Okoli made a suggestive comment to Plaintiff, the sexual nature of which she "immediately understood," given her knowledge of Okoli's reputation. *Id.* at 3.

As noted *supra*, Plaintiff did not immediately report her attack. *Id.* at 3–4. And, once Roe did report her attack to Officer Ross in May of 2021, he failed to advance the report to the prison supervisors. Def.'s SUF ¶ 14; Roe Aff. 4–5. In fact, the CVCU Superintendent's Office only found out about the allegations underlying this matter in July of 2021, while conducting its previously described investigation into other inmates' complaints about Okoli. Roe Aff. 5.

After CVCU completed its investigation, it terminated Okoli's employment and reported its findings to the Commonwealth Attorney's Office. Def.'s SUF ¶ 13; *see* Pl.'s Opp'n Ex. 2, ECF No. 46-2. However, no criminal charges were brought. Def.'s SUF ¶ 13; Pl.'s Opp'n Ex. 2.

### 3. Defendant Fowlkes's Tenure at CVCU

Defendant Fowlkes began her position as the CVCU Superintendent on October 25, 2017. Def.'s SUF ¶ 2. While she was Superintendent, Fowlkes headed all operations at CVCU, including PREA compliance procedures.[4] *Id.* ¶¶ 2, 19. As implemented by Fowlkes, all CVCU staff members "receive[d] comprehensive, initial training on prevention, detection, response, reporting, investigation, and disciplinary sanctions related to sexual abuse" at the time of hire. *Id.* ¶ 21. CVCU staff members then received "annual, mandatory in-service training regarding PREA and

---

advantage of the blind spots to have sex with each other, which correctional officers would permit, "knowing that it would not be caught on camera." *Id.* at 6. While Defendant Fowlkes asserts that some of these blind spots are for inmate privacy, Def.'s SUF ¶ 46, there are also blind spots in hallways and in the "rec yard," Roe Aff. 6–7.

[4] Some of these procedures, however, were delegated to a PREA compliance officer. Fowlkes Aff. ¶¶ 20–21.

their obligations to prevent and report any instances of alleged sexual misconduct." *Id.* ¶ 22

During her tenure, Defendant Fowlkes "ensured that all staff members—including Okoli—

remained up to date on all of their yearly PREA training." *Id.* ¶ 35.  Beyond the strict prohibition

on fraternization between CVCU employees and inmates, this PREA training:

> Emphasize[d] that all VDOC employees are responsible for the detection,
> prevention, and reporting of known and suspected instances of sexual misconduct
> . . . . The training highlight[ed] that any staff members who fail to report violations
> may also be subjected to adverse employment action, up to and including
> termination of their employment.

*Id.* ¶ 34.

Prison staff were able to report actual or suspected misconduct "verbally, in writing, or

through the established reporting hotline" reachable by picking up any of the facility's telephones

and dialing #55.  Fowlkes Aff. ¶¶ 27, 31.  This number was advertised on posters throughout the

facility. *Id.* ¶ 27.  Finally, during meetings with CVCU staff and supervisors, Defendant Fowlkes

"repeatedly emphasized all employees' responsibilities under PREA, including the requirement to

avoid fraternization, to avoid being in a one-on-one situation with inmates, and underscor[ed] the

mandatory PREA reporting requirements for all staff." Def.'s SUF ¶ 48.

CVCU underwent regular audits of its PREA compliance. *Id.* ¶¶ 38–42.  From 2015

through 2020, CVCU was found to comply with PREA requirements, and the auditors did not

suggest any corrective actions. *Id.* ¶¶ 38–41.  These PREA audits also included reviews of the

facility's surveillance system, which was found to be "very adequate." *Id.* ¶ 38.  However, upon

arriving at CVCU, Defendant Fowlkes completed an independent assessment of the security

cameras' coverage and discovered the blind spots described *supra*. *Id.* ¶ 43.  While Defendant

Fowlkes "wanted [the blind spots] to be corrected," she lacked the unilateral authority to order and

install additional cameras. *Id.*  As such, Defendant Fowlkes submitted multiple requests for

additional cameras, which included suggestions for sources of funding to pay for them. *Id.* ¶ 44. These requests, however, were never approved. *Id.*

Nevertheless, "[t]o mitigate any security risk posed by these blind spots," Defendant Fowlkes promulgated several policies regarding the blind spots:

> [W]henever inmates were present, an officer was to be stationed in the areas of the prison that lacked camera coverage, including the hallway outside of the laundry area in the basement. . . . CVCU employees [we]re directed not to spend unnecessary time with an offender of opposite sex when out of range of camera. And, unless there was an emergency, male officers were not allowed to enter inmate bathrooms or shower areas when those areas were occupied by inmates. Even when clearing those areas during rounds, male officers had to make a verbal announcement prior to entering.

*Id.* ¶¶ 45, 47. These policies were reinforced through verbal instruction to staff members at the beginning of every shift. *Id.* ¶ 47.

Defendant Fowlkes's final day as CVCU Superintendent was December 25, 2020, when she was promoted to Warden at a different facility. Def.'s SUF ¶ 3. However, she performed monthly rounds and completed CVCU paperwork as needed while her successor, Rebecca Young, transitioned into the role. *Id.*; Fowlkes Aff. ¶ 7. Rebecca Young finalized her transition sometime between March and May of 2021.[5] Fowlkes Aff. ¶ 7; Roe Aff. ¶ 4.

Throughout her briefing and attached affidavit, Defendant Fowlkes firmly contends that she had no actual knowledge nor reason to know of Okoli's predatory behavior, Okoli's particular assault upon Plaintiff, or Officer Ross's mishandling of Plaintiff's initial report. *E.g.*, Def.'s SUF ¶¶ 14–17; Tucker Aff. ¶¶ 12, 14, 18, 33, 52.

---

[5] The parties dispute the exact dates of this transition. Defendant Fowlkes contends that Young had fully assumed the role by the end of March 2021, Fowlkes Aff. ¶ 7, but Plaintiff asserts that Defendant Fowlkes was not fully replaced by Young until May of 2021, Roe Aff. ¶ 4. While it strikes the Court that Defendant Fowlkes is better positioned to confirm the particular dates of her employment transition, this fact is not strictly material. Thus, the Court need not resolve the dispute. For the instant purposes, the Court simply understands that Defendant Fowlkes was transitioning out of her role at CVCU from December 25, 2020, to May of 2021, during which time she was largely physically absent.

**B. Relevant Procedural History**

Proceeding under a pseudonym, Plaintiff Roe filed the instant case against Defendants Fowlkes and Okoli on February 29, 2024.  Compl., ECF No. 1.  Both Defendants were served with the Complaint on March 5, 2024.  Summons, ECF No. 12; Summons, ECF No. 13.  Defendant Fowlkes filed a Motion to Dismiss on March 26, 2024, Mot. Dismiss, ECF No. 16, and an Answer on September 27, 2024.  ECF No. 28.  Defendant Okoli never appeared, and on September 25, 2024, the Clerk entered Okoli's default.  Clerk's Entry Default, ECF No. 25.  The Court denied the Motion to Dismiss on January 7, 2025.  Mem. Op., ECF No. 33; Order, ECF No. 34.

Defendant Fowlkes filed the instant Motion on January 21, 2025.  Mot. Summ. J., ECF No. 35.  On February 11, 2025, Roe filed her Memorandum in Opposition.[6]  Mem. Opp'n, ECF No. 46.  On February 21, 2025, Fowlkes filed her Reply in Further Support of Fowlkes's Motion for Summary Judgment ("Reply").  Reply, ECF No. 57.  On March 3, 2025, the Court held a hearing on the instant Motion, during which it heard argument as to the existence of a genuine issue regarding Defendant Fowlkes's knowledge of Defendant Okoli's predation.

## II. STANDARD OF REVIEW

The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).  "[T]he mere existence of some alleged factual

---

[6] Plaintiff also submitted a five-page summary of her arguments in opposition entitled "Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment," ECF No. 45.  However, without obtaining leave of court, a party opposing a motion is limited to filing a single response brief.  E.D. Va. Loc. Civ. R. 7(F).  Because Plaintiff did not obtain leave, the Court only considers her Memorandum in Opposition.

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A material fact is one that might affect the outcome of a party's case. *Id*. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc*., 264 F.3d 459, 465 (4th Cir. 2001). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor. *Id*.

Furthermore, to defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another," or the "mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co*., 105 F.3d 188, 191 (4th Cir. 1997) (citations omitted); *Anderson*, 477 U.S. at 252. Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Adver., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "Thus, if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment." *Id*. (quotation marks and citation omitted).

It is important to remember that a motion for summary judgment does not alter the parties' ultimate burdens; therefore, a movant may properly demonstrate that summary judgment is warranted simply by demonstrating that the non-movant will not be able to discharge its burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

9

element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). Thus, the summary judgment standard may alternatively be understood as one which mirrors the standard for a directed verdict. *Anderson*, 477 U.S. at 250–51.

### III. ANALYSIS

Defendant Fowlkes moves for summary judgement as to Counts Two and Three[7] of the Complaint. In support, Defendant Fowlkes argues that Count Two cannot lie against her as a matter of law. Def.'s Mem. Supp. 15, ECF No. 36. As to Count Three, Defendant Fowlkes chiefly argues that the undisputed record demonstrates that she was ignorant of any misconduct by Okoli or others during her tenure at CVCU. *Id.* at 1–2. Plaintiff argues that, as a factual matter, Fowlkes had actual and constructive knowledge of her subordinate's conduct. *See generally* Mem. Opp'n. The Court agrees with Defendant Fowlkes as to both points, which precludes the possibility of Plaintiff's success at trial. As such, Defendant Fowlkes is entitled to judgement as a matter of law, and the Court will grant her Motion and dismiss Defendant Fowlkes from the instant action.[8]

**A. There is no Genuine Dispute as to Defendant Fowlkes's Lack of Actual or Constructive Knowledge of Defendant Okoli's Conduct**

After a review of the record and the parties' oral arguments, the Court finds that Plaintiff's evidence is insufficient to allow a reasonable fact-finder to determine that Defendant Fowlkes had either actual or constructive knowledge of Defendant Okoli's misconduct or any propensity for

---

[7] She is not named in Count I.

[8] Defendant Fowlkes also argues that she is entitled to qualified immunity and restates her arguments from her Motion to Dismiss. Mem. Supp. Summ. J. 28. However, because the Court finds no constitutional violation, it does not reach this inquiry.

such conduct, prior to his assault on Plaintiff, or to otherwise create a genuine issue of material fact in the face of Defendant Fowlkes's sworn assertions to the contrary.

A brief reminder as to the mechanics of Federal Rule of Civil Procedure 56 helps to understand this conclusion. Ultimately, the summary judgement analysis involves burden shifting. "Rule 56 first imposes a burden of production on the moving party to make a prima facie showing that it is entitled to summary judgment." 10A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2727.1 (4th ed. 2024). "[D]espite the usual rule that all doubts are resolved against the moving party," the movant's produced evidence "must be accepted as true" for the purposes of the summary judgment analysis, unless the opposing party produces competent evidence to the contrary.[9] *Id.*

After a movant has made and supported its motion for summary judgement, the burden shifts to the opposing party to produce competent evidence in support of its contradictory position. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 585–86. A party opposing a motion for summary judgment will only rebut the presumption of truth afforded to the movant's evidence if the opponent can show that a "genuine dispute" exists. *Id.*

Not every disagreement as to the facts constitutes a "genuine" dispute. *E.g.*, *Anderson*, 477 U.S. at 247–48. For instance, as the Court described *supra*, "[a] party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Stone*, 105 F.3d at 191.

When it comes to evidence regarding a witness's state of mind, courts have often observed that such evidence typically "entails the drawing of factual inferences as to which reasonable men

---

[9] Alternatively, an opposing party may rebut the presumption of truth by providing good reason as to "why he is unable to present facts justifying opposition to the motion." 10A Wright & Miller, *supra*, § 2727.1; Fed. R. Civ. Proc. 56(d).

might differ—a function traditionally left to the jury." *Hall v. Williams*, 1992 WL 71556, at *3 (4th Cir. 1992) (citing 10A Wright & Miller § 2730). Nevertheless, "the fact that a party desires to have an affiant's statements tested by a jury, in and of itself, will not preclude a grant of the motion unless the evidence presented casts sufficient doubt on the affiant's credibility to create a genuine dispute of material fact." 10A Wright & Miller § 2727.1; *see also Wash. Post. Co. v. Keogh*, 365 F.2d 965, 967–68, 970–71 (D.C. Cir. 1996) ("That state of mind should generally be a jury issue does not mean it should always be so in all contexts, especially where the issue is . . . ordinarily inferred from objective facts.") (reversing a denial of summary judgment on a libel action where unimpeached depositions demonstrated the affiant's ignorance as to the falsity of the publication, and opposing party failed to provide competent evidence of affiants' recklessness as to the truth). In other words, the party opposing summary judgment cannot rebut the presumption of truth afforded to a movant's affidavit by nakedly asserting that the affiant is lying. Rather, the opposing party must present affirmative evidence that casts reasonable doubt on the affiant's statement.

Plaintiff may only succeed in her claims against Defendant Fowlkes by showing Fowlkes had actual or constructive knowledge of Defendant Okoli's predatory conduct prior to his attack on Plaintiff. Of course, actual knowledge is satisfied by a showing of subjective awareness of a fact. *Knowledge*, Black's Law Dictionary (12th ed. 2024); *accord Intel Corp. Investment Policy Comm. v. Suluma*, 140 S. Ct. 768, 777 (2020). Conversely, one has constructive knowledge of a fact if it is ascertainable through reasonable diligence or care. *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 175 (4th Cir. 2014). Thus, even when an individual has no actual knowledge of a fact, the law might impute knowledge to that individual where he or she should have known of it. *See id.*

In support of her Motion, Defendant Fowlkes provides the Court with an affidavit in which she swears that she had no knowledge of Defendant Okoli's predatory behavior, nor reason to believe he may have been behaving inappropriately.[10]   Fowlkes Aff. ¶¶ 12, 14, 17, 18, 33, 49. Plaintiff contends, however, that Defendant Fowlkes must have known of Defendant Okoli's conduct, citing CVCU's relatively small size combined with Okoli's pervasive reputation amongst inmates.[11]  Mem. Opp'n 9–10.

Without actual evidence[12] contradicting Defendant Fowlkes's multiple sworn assertions of ignorance, Plaintiff's argument is tantamount to a naked insistence that Defendant Fowlkes is lying, which is insufficient to demonstrate a genuine dispute of fact.  10A Wright & Miller, *supra*, § 2727.1; *see also Levesy v. Scolese*, 2023 WL 5835763, at *2 n.7 (E.D. Va. Sept. 7, 2023) (determining that a plaintiff's unsupported assertion that an affiant was "lying about her behavior" constituted a conclusory allegation, and was therefore "insufficient to create a genuine dispute of fact") (citing *Reddy v. Buttar*, 38 F.4th 393, 403 (4th Cir. 2022)); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 578 (7th Cir. 2003) (holding, in the context of an employment discrimination claim, "[t]o avoid summary judgment in favor of [the employer], [the employee] must do more than simply allege that the [affiants] are lying about their real reason for terminating him—under Rule

---

[10] Specifically, Defendant Fowlkes swears that she did not receive any complaints about Okoli's conduct, Fowlkes Aff. ¶¶ 12, 33; that she "had no knowledge, direct or indirect, of any information indicating or tending to indicate that [] Okoli might be behaving inappropriately with inmates at CVCU," *id.* ¶ 14; that "Plaintiff Jane Roe never reported her allegations or concerns about [] Okoli" to Fowlkes, *id.* ¶ 17; "[n]o other inmate ever reported allegations or concerns about [] Okoli" to Fowlkes, *id.* ¶ 18; and that she did not receive any reports "indicating that staff or inmates were taking advantage of any blind spots in the surveillance system," *id.*¶ 49.

[11] Plaintiff also implies that one could infer Defendant Fowlkes's knowledge based on Plaintiff's report to Officer Ross.  *See* Mem. Opp'n 3–5.  However, this report occurred in May of 2021—well after Okoli's assault on Plaintiff.  Def.'s SUF ¶ 12; Roe Aff. 4–5.  As the Court has already noted, the relevant question is whether Defendant Fowlkes had knowledge of Okoli's predation *prior to* the assault.  Thus, Plaintiff's May report would not allow a reasonable factfinder to infer the requisite knowledge by Defendant Fowlkes.

[12] Plaintiff asserts in her affidavit that "Superintendent . . . Fowlkes should have and would have known of the reputation of one of her employees, as many inmates spoke about Okoli's reputation."  Roe Aff. 5.  The Court cannot consider the first half of this assertion as evidence because it is not based on Plaintiff's personal knowledge. Fed. R. Civ. Proc. 56(c)(4).

56, he must point to specific facts sufficient to cast doubt on the . . . reasons offered by [the employer], or which raise doubts as to the credibility of the [affiants'] testimony.").  Accordingly, for the purposes of the instant analysis, Defendant Fowlkes's uncontroverted statement must be accepted as true, and the Court finds that there is no genuine issue as to her lack of actual knowledge.

The Court similarly finds that there is no genuine issue as to Defendant Fowlkes's lack of constructive knowledge.  The undisputed record demonstrates that all ancillary facts of which Fowlkes *was* aware, including Okoli's professional record, performance reviews, and PREA training, tend to indicate that Okoli was a law-abiding employee.  As stated by Fowlkes in her affidavit, she "had no reason to believe that a supervisory officer with over 8 years of experience within VDOC, no prior formal disciplinary actions, no criminal record, and who had received extensive, repeated training on his obligations under PREA, might be sexually abusing or harassing inmates at CVCU."  Fowlkes Aff. ¶ 52.

Plaintiff asserts that Defendant Okoli's reputation was so well-known amongst inmates that, "in the proper exercise of [her] official responsibilities, [Fowlkes] should have known [about it]."  Mem. Opp'n 10 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987)).  However, Plaintiff's assertion is not grounded in any evidence before this Court.  Plaintiff does not describe, for instance, which aspect of Defendant Fowlkes's responsibilities would have caused her to confront Okoli's reputation.  The Court cannot find any evidence in the record demonstrating that Defendant Fowlkes would have had the responsibility or need to inquire as to the inmates' impressions of correctional officers.  And, as described above, Okoli's record gave Fowlkes no reason to suspect his danger.  As such, the undisputed record demonstrates that Fowlkes had neither actual nor constructive knowledge of Okoli's misconduct.

Both conclusions are bolstered when one considers Plaintiff's ability to prove Defendant Fowlkes's knowledge—an essential element of her claim—at trial. In *Celotex Corp. v. Catrett*, the Supreme Court reminded lower courts that, notwithstanding the burden-shifting involved in the summary judgment analysis, the ultimate question on such a motion is whether a reasonable fact-finder could determine that the plaintiff will bear their burden at trial. 477 U.S. at 322. Thus, "Rule 56(c) *mandates* the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial." This remains the case no matter which party moved for summary judgment. *See id.* "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

Because the summary judgment standard considers a plaintiff's ability to bear its ultimate burden, the Supreme Court and Fourth Circuit have often stated that the standard of Federal Rule of Civil Procedure 56 is the same as that of Federal Rule of Civil Procedure 50, which sets out a district court's authority to enter a judgment as a matter of law.[13] *E.g.*, *Anderson*, 477 U.S. at 250–53; *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436 (table) (4th Cir. 1999). Rule 50 provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may [enter a] . . . judgment as a matter of law.

Fed. R. Civ. P. 50(a)(1).

---

[13] Judgments as a matter of law were previously known as "directed verdicts." Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment.

In determining whether a party has provided a legally sufficient evidentiary basis for a favorable verdict, a court is constrained by the familiar rules of summary judgment—it may not make credibility determinations or weigh evidence, and it must make all inferences in favor of the nonmovant. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). However, as in summary judgment, not all inferences warrant submission to the jury. *See, e.g.*, *Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996) (holding that parties are not entitled to "the benefit of unreasonable inferences"); *accord Wratchford v. S.J. Groves & Sons Co.*, 405 F.2d 1061, 1066 4th Cir. 1969). Indeed, "it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Bus. Dev. Corp. v. United States*, 428 F.2d 451, 453 (4th Cir. 1970) (quoting *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908 (1958)); *accord Fontenot v. Taser Intern., Inc.*, 736 F.3d 318, 332 (4th Cir. 2013). In other words, a plaintiff has not met their burden if they have failed to introduce into the record substantial evidence in support of an essential element, such that a verdict in their favor would require the jury to engage in impermissible levels of speculation. 9B Wright & Miller § 2528 ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party."); *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 280 (4th Cir. 1999) ("A Rule 50(b) motion should be granted if a district court determines . . . that substantial evidence does not support the jury's findings.").

Because a motion for summary judgment requires the Court to consider the burden-bearer's ultimate ability to make its case, a plaintiff, when faced with a motion for summary judgment by the defendant, must provide the Court with all of their material evidence. 10A Wright & Miller § 2727 ("The nonmovant is not entitled to a trial on the basis of a hope that he can produce some

evidence at that time."); *see Celotex Corp.*, 477 U.S. at 326 (noting that a motion for summary judgment puts the nonmoving party on notice to "come forward with *all of* her evidence") (emphasis added); *see also Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir. 1978). Put differently, if a plaintiff possesses evidence that would make the difference between satisfying their burden and falling short, such plaintiff cannot reserve that evidence for trial in the face of a motion for summary judgment.

Plaintiff's affirmative evidence of Defendant Fowlkes's knowledge of Defendant Okoli's conduct prior to her assault consists of: (1) Plaintiff's affidavit, in which she describes Defendant Okoli's predatory reputation amongst CVCU inmates, Roe Aff. 3–4; and (2) a public record demonstrating the relatively small size of CVCU, Mem. Opp'n Ex. 4, ECF No. 46-4. If this case were to proceed to trial, Plaintiff would ask a jury to find, based on these two pieces of evidence alone, that Defendant Fowlkes had either actual or constructive knowledge of Okoli's reputation prior to his assault on Plaintiff. *Hoschar*, 739 F.3d at 175.

Plaintiff does not provide any meat for these evidentiary bones. For instance, Plaintiff provides no cognizable theory as to how or when Defendant Fowlkes might have gained knowledge of Defendant Okoli's reputation. Similarly, as to evidence of Defendant Fowlkes's constructive knowledge, Plaintiff wholly fails to present the Court with any information about Defendant Fowlkes's responsibilities—much less identify which of those responsibilities, if performed reasonably, would have occasioned her to learn of Okoli's reputation. *Id.*

At the April 3 hearing, counsel for Plaintiff speculated that Officer Ross's testimony might develop these theories. However, as stated by the Court from the bench, and as noted *supra*, a litigant may not reserve evidence for trial in the face of a summary judgment motion. Plaintiff is "not entitled to a trial on the basis of a hope" that further evidence might develop. 10A Wright &

Miller § 2727. Thus, Plaintiff's position necessarily rises and falls on the evidence produced in opposition of the instant Motion.

The Court finds that Plaintiff's limited evidence does not provide a legally sufficient basis for a reasonable jury to find that Defendant Fowlkes had knowledge of Defendant Okoli's conduct or predatory nature prior to her assault. Plaintiff's tenuous inferences presented in an attempt to undermine this apparent lack of knowledge would ask the jury to engage in impermissible speculation and conjecture. *Bus. Dev. Corp.*, 428 F.2s at 453. As such, the Court finds that Plaintiff cannot meet her burden at trial as to Defendant Fowlkes's knowledge—actual or constructive. For this reason, too, the Court finds there is no genuine issue of material fact as to Fowlkes's knowledge (or lack thereof), and will treat the matter as settled for purposes of the instant motion.

## B. Count Two Fails to State a Claim against Defendant Fowlkes

Invoking 42 U.S.C. § 1983, Count Two alleges violations of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights by both Defendants, and asserts that "[t]he acts and omissions of the Defendants intruded or caused the intrusion into the realm of personal privacy, bodily security, and integrity of Plaintiff." Compl. ¶¶ 60–63.

Defendant Fowlkes argues that neither the Fourth Amendment nor the substantive due process right which stems from the Fifth and Fourteenth Amendments are applicable to the case at bar. Def.'s Mem. Supp. 15–16. Plaintiff does not address this argument in her briefing, *see generally* Mem. Opp'n, and based on its own review of the facts and law, the Court agrees with Defendant Fowlkes. Thus, the Court will grant Defendant Fowlkes's Motion as to Count Two.

Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation omitted). Thus, the § 1983 analysis "begins by identifying the specific constitutional

right allegedly infringed" by Defendants.  *Id.*  A § 1983 action cannot lie if the plaintiff fails to demonstrate an underlying constitutional violation.  *See id.*  Because neither the Fourth, Fifth, or Fourteenth Amendment apply to the instant action, Count Two fails to state a claim.

### 1.  Plaintiff Does Not Establish a Fourth Amendment Violation

The Fourth Amendment protects citizens from unreasonable intrusions upon legitimate expectations of privacy.  *E.g.*, *Doe v. Broderick*, 225 F.3d 440, 450 (4th Cir. 2000).  Plaintiff's briefing does not elucidate the intrusion about which she complains.  *See* Mem. Opp'n 8–15, ECF No. 46.  Her Complaint, however, alleges that Defendants "intruded or caused the intrusion into [Plaintiff's] . . . personal privacy, bodily security, and integrity."  Compl. ¶¶ 60–63.  The only such intrusion alleged by Plaintiff in her Complaint is the assault by Okoli.  *See generally id.*

In the prison context, an inmate has a "right to bodily privacy" under the Fourth Amendment, which is violated upon "the involuntary exposure of [her] genitals in the presence of the opposite sex," often in the context of body cavity or strip searches.  *Wilkins v. Upton*, 639 F. App'x 941, 944 (2016) (citing *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)).  All other intrusions upon an inmate's bodily integrity, however, are properly analyzed under the Eighth Amendment.  *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 530 (1984)).

Plaintiff alleges sexual assault by Defendant Okoli; however, her allegations do not involve the involuntary exposure of her genitals.  Compl. ¶¶ 26–31.  Plaintiff's briefing on the instant Motion likewise reveals no such exposure.  *See generally* Mem. Opp'n.  As such, Plaintiff does not state a violation of the Fourth Amendment, nor does the evidence presented in opposition to the Motion for Summary Judgment independently establish such a violation.  Plaintiff cannot rest her § 1983 claim on an otherwise unalleged and unsupported constitutional violation.

### 2. Neither the Fifth nor Fourteenth Amendments Apply to Plaintiff's Claims

The remainder of Count Two cites violations of the Fifth and Fourteenth Amendments. Compl. ¶ 62.   The Fifth and Fourteenth Amendments prohibit violations of substantive due process.  *Sacramento v. Lewis*, 523 U.S. 833, 841 (1998).   A litigant articulates such a violation by alleging "an abuse of executive power . . . clearly unjustified by any legitimate objective of law enforcement."  *Id.* ("The Due Process Clause . . . was intended to prevent [the] government 'from abusing [its] power, or employing it as an instrument of oppression.'" (quoting *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992))).

The Supreme Court, however, has consistently instructed that substantive due process rights cannot serve as a catch-all category for governmental conduct that is more specifically controlled by a different amendment.  *Collins*, 503 U.S. at 125.   Thus, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  *Sacramento*, 523 U.S. at 842 (internal citation omitted).

Per the Supreme Court's instruction, Plaintiff cannot bring a § 1983 action based on the Fifth or Fourteenth Amendment if the alleged violations are more explicitly addressed by a different amendment.  *Id.*  As the Court analyzes in full below, Plaintiff's claims of sexual assault and willful indifference are well-covered by the rubric of the Eighth Amendment, such that applying the prohibitions of substantive due process would violate the Supreme Court's express admonition.  *See infra* Part III.C.  Thus, Count Two fails insofar as it purports to stem from a substantive due process violation.  Because Plaintiff fails to attach Count Two's invocation of

§ 1983 to an actionable constitutional violation, the Court will grant Defendant's Motion for Summary Judgment as to Count Two.

**C. Defendant Fowlkes is Entitled to Summary Judgment as to Count Three**

Count Three also invokes 42 U.S.C. § 1983 but alleges violations of Plaintiff's Eighth Amendment rights. Compl. ¶¶ 64–75. Specifically, the Complaint asserts that Defendant Fowlkes developed and maintained "deficient customs, policies, and practices," which manifested a deliberate indifference to Plaintiff's Eighth Amendment rights and allowed Defendant Okoli to operate in an "environment of impunity." *Id.* Taking seriously the Fourth Circuit's admonition to treat civil rights complaints with particular care, *e.g.*, *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999), the Court construes Count Three to rest on either a theory of § 1983 supervisory liability stemming from subordinates' violations of Plaintiff's rights *or* a theory of direct Eighth Amendment violations by Defendant Fowlkes.

While the parties' arguments focus on Defendant Fowlkes's liability as it relates to her alleged failure to intervene with respect to Defendant Okoli's sexually abusive conduct, *see, e.g.*, Mem. Opp'n 1, the briefing and record suggest two additional possibly violative failures by Defendant Fowlkes: her alleged failure to adequately address surveillance camera blind spots, *id.* at 10, and her alleged failure to adequately train subordinates as to the PREA reporting procedures, *id.* at 11. The Court analyzes each possible avenue of liability in turn.

1. Failure to Intervene as to Okoli

Plaintiff's case against Defendant Fowlkes chiefly relies on her theory that Fowlkes had either constructive or actual knowledge of Defendant Okoli's propensity for sexual abuse but failed to intervene. *See* Mem. Opp'n 1–3. In the instant Motion, Defendant Fowlkes vigorously contends that she had neither constructive nor actual knowledge and therefore cannot be held liable for her inaction. Mem. Supp. Summ. J. 1–2. As set forth at length above, *see supra* Part III.A., the Court

21

agrees, and, as explained in full, *infra*, it must therefore further agree that Plaintiff cannot prevail on this theory.

> a. *Section 1983 Supervisory Liability*

In certain circumstances, supervisors may be held liable under 42 U.S.C. § 1983 "for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, such liability "is not premised upon *respondeat superior* but upon . . . supervisory indifference or tacit authorization." *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035 (1985)). In other words, a supervisor does not mechanically incur § 1983 liability when a subordinate commits a constitutional violation; instead, the supervisor must have engaged in some affirmative act or omission which manifests indifference to or authorization of the underlying violation, thereby partly causing the violation itself. *Id.*; 14A C.J.S. *Civil Rights* § 464 (2025) ("A supervisory official is liable for acts he or she personally participates in or which he or she causes. To be liable, a supervisor must be personally responsible for the deprivation of a constitutional right." (collecting cases)).

The Fourth Circuit has articulated three elements to establish § 1983 supervisory liability:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799 (internal quotations omitted). This standard places a heavy burden of proof upon a plaintiff,

> for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct.

> A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

*Id.* (quoting *Slakan*, 737 F.2d at 372–73).

### i. *Predicate constitutional violation by Okoli*

Before addressing the elements of Defendant Fowlkes's liability, the Court clarifies that Defendant Okoli's assault did, indeed, violate Plaintiff's Eighth Amendment rights. "The Eighth Amendment prohibits cruel and unusual punishment in penal institutions. Whether a specific act constitutes cruel and unusual punishment is measured by 'the evolving standards of decency that mark the progress of a maturing society.'" *Wood v. Beauclair*, 692 F.3d 1041, 1045–46 (9th Cir. 2012) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The use of force upon an inmate, including sexual contact, violates the Eighth Amendment if it is applied "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. Conversely, force "applied in a good-faith effort to maintain or restore discipline" does not offend the protections of the Eighth Amendment. *Hudson*, 503 U.S. at 7.

The Eighth Amendment use of force analysis involves two inquiries: "(1) a 'subjective' inquiry into whether prison staff acted 'with a sufficiently culpable state of mind'; and (2) an 'objective [inquiry]' that [asks] whether 'the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.'" *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020) (quoting *Hudson*, 503 U.S. at 4, 8); *accord Hall*, 1992 WL 71566, at *3. Nonconsensual sexual contact between a prison guard and an inmate satisfies both inquiries without a consideration of the particular facts. *See Woodford v. Ngo*, 548 U.S. 81, 118 (2006) (Stevens, J., dissenting) ("Accordingly, those inmates who are sexually assaulted by guards . . . have suffered grave deprivations of their Eighth Amendment rights."). "Because there is no legitimate penological

purpose served by a sexual assault, the subjective component . . . is presumed" upon a showing that a sexual assault occurred. *Bearchild*, 947 F.3d at 1141. Further, as to the objective component, "[a]ny sexual assault is objectively 'repugnant to the conscience of mankind' and therefore not *de minimis* for Eighth Amendment purposes." *Id.* at 1144 (quoting *Hudson*, 503 U.S. at 10).

Here, the undisputed facts demonstrate that Defendant Okoli, a prison guard, sexually assaulted Plaintiff and at least four other inmates. *See generally* SIU Report, ECF No. 46-3. Defendant Okoli has accordingly violated the Eighth Amendment rights of Plaintiff and any other inmate he assaulted.

### ii. *Defendant Fowlkes's knowledge*

With the predicate constitutional violation in mind, the Court considers if Defendant Fowlkes's conduct, in relation to Okoli's assault upon Plaintiff, leads to § 1983 supervisory liability. As noted, the first element plaintiff must demonstrate is "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury" to the plaintiff and other similarly situated individuals. *Shaw*, 13 F.3d at 799.

The record before the Court undisputedly demonstrates that Okoli posed a pervasive risk to Plaintiff and the other CVCU inmates; in fact, in the mere eleven months between his first day and the eventual investigation into his conduct, he was reported to have sexually assaulted at least five inmates. Def.'s SUF ¶ 12; *see generally* SIU Report, ECF No. 46-3. And, even when his actions did not amount to assault, Okoli made frequent sexual advances upon the inmates. SIU Report 2; Mem. Opp'n 7; Roe Aff. 2. Such predatory and unrelenting conduct surely constitutes the kind of "pervasive and unreasonable risk of constitutional injury" contemplated by § 1983.

24

*Shaw*, 13 F.3d at 799. However, a risk of constitutional injury—no matter how significant—will not result in liability for a supervisor unless the supervisor had actual or constructive knowledge of the risk. *E.g.*, *id.* Thus, the dispositive question on this element is whether Defendant Fowlkes had actual or constructive knowledge of Okoli's pattern of sexual abuse and predation.

The Court has already found that the undisputed record demonstrates that Defendant Fowlkes had no subjective knowledge nor constructive knowledge of Defendant Okoli's conduct. *Supra* Part III.A. Thus, Plaintiff's theory of § 1983 supervisory liability as to Fowlkes's failure to intervene as to Okoli's predation fails on the first element.[14]

### b. Direct Eighth Amendment Liability

A prison supervisor's inaction in the face of a subordinate's misconduct may also directly violate the Eighth Amendment where the supervisor's inaction constitutes "deliberate indifference to a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828–29 (1994) (internal citation omitted). To succeed on a theory of direct liability, a plaintiff must satisfy three elements: (1) that the relevant injury amounted to an objectively "serious deprivation of [the plaintiff's] rights," *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014); *see also Farmer*, 511 U.S. at 834; *Makdessi*, 789 F.3d at 133; (2) that the defendant prison official had actual knowledge of the risk of the injury, *Danser*, 772 F.3d at 347; *Farmer*, 511 U.S. at 834; and (3) that the prison official's response to the knowledge was "patently inadequate," *Cox v. Quinn*, 828 F.3d 227, 237 (4th Cir. 2016).

---

[14] A claim of supervisory liability pursuant to § 1983 also requires a showing that "the supervisor's response to [knowledge of the constitutional violation] was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practice," and "there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799. Of course, without knowledge of Okoli's conduct or reputation prior to Plaintiff's assault, Fowlkes could not have tacitly authorized the assault nor caused it. As such, this claim also fails on the remaining elements.

Here, the relevant injury is Okoli's sexual assault upon Plaintiff, which, as a matter of law, is an objectively serious deprivation of her rights. *Woodford*, 548 U.S. at 118; *Jackson v. Holley*, 666 F. App'x 242, 244 (4th Cir. 2016); *Bearchild*, 947 F.3d at 1143. Thus, the first element of Plaintiff's direct Eighth Amendment claim against Fowlkes is satisfied.

The second element requires Plaintiff to show that, prior to Okoli's assault on Plaintiff, Fowlkes was subjectively aware that Okoli posed "an excessive risk" to inmates. *Danser*, 772 F.3d at 347; *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004). This standard is a rigorous one and only discharged upon a showing that the official was subjectively "aware of facts from which the inference could be drawn that a substantial risk of harm exists," *and* that the official actually drew such an inference. *Farmer*, 511 U.S. at 837. While subjective awareness may be demonstrated by circumstantial evidence, *Makdessi*, 798 F.3d at 133, such evidence must nevertheless amount to a showing of actual knowledge, *Danser*, 772 F.3d at 347. Unlike the standard under § 1983 supervisory liability, constructive notice is insufficient to show deliberate indifference within the meaning of the Eighth Amendment. *Id.* (citing *Rich v. Bruce*, 192 F.3d 336, 338–40 (4th Cir. 1997)).

The undisputed record, as analyzed by the Court *supra* Part III.A., quickly resolves both remaining elements in Defendant Fowlkes's favor. Fowlkes had no subjective knowledge of Okoli's predatory behavior, nor any reason to believe he posed a risk to inmates. Thus, this claim fails on the second element. Further, as to element three, Fowlkes's nonresponse cannot be considered patently inadequate without the attending requisite knowledge. Thus, as a matter of law, Fowlkes could not have been deliberately indifferent to an excessive risk of constitutional

injury.  As such, Plaintiff's claim of direct Eighth Amendment liability stemming from Okoli's assault also fails.[15]

### 2. Failure to Address Blind Spots

Plaintiff's next theory of liability stems from the known blind spots in the CVCU security camera coverage, which were exploited by Okoli and other correctional officers to abuse inmates. Roe. Aff. 4; Mem. Opp'n 10; *see also* Def.'s SUF ¶ 43.  Plaintiff argues that this abuse was "well-known throughout the prison," and, as such, a reasonable jury could find Defendant Fowlkes liable for failing to correct the blind spots.  Mem. Opp'n 10.  The Court finds that, while Defendant Fowlkes was aware of the blind spots, she took adequate corrective action.  As such, she is neither liable under a theory of supervisory liability nor direct liability.

### a. Section 1983 Supervisory Liability

As described above, to succeed on a theory of § 1983 supervisory liability, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge of an unreasonable risk of constitutional injury posed by a subordinate's conduct; (2) the supervisor, upon gaining such knowledge, responded inadequately; and (3) the supervisor's inadequate response affirmatively caused a constitutional injury upon the plaintiff.  *Shaw*, 13 F.3d at 799.  As applied to this particular theory of liability, Plaintiff must show that the blind spots posed an unreasonable risk of constitutional injury to Plaintiff and other inmates; that Fowlkes had actual or constructive knowledge of the blind spots; that Fowlkes's response to the blind spots was inadequate; and that Fowlkes's inadequate response was a contributing cause of Okoli's assault on Roe.  *See id.*

---

[15] Plaintiff's Complaint also alleges that Defendant Fowlkes acted with "deliberate indifference in hiring . . . and retaining Defendant Okoli."  Compl. ¶ 3.  However, for the same reasons Defendant Fowlkes cannot be held liable for failing to intervene as to Defendant Okoli's behavior, she cannot be held liable for hiring and retaining him: the undisputed record demonstrates that Defendant Fowlkes had no reason to believe—either at the time of Defendant Okoli's hiring or through the time of Okoli's assault on Roe—that Defendant Okoli posed a risk to the inmates at CVCU.  *See supra* Part III.A.

Defendant Fowlkes admits that she had actual knowledge of the blind spots resulting from her independent review of the surveillance coverage upon commencing her position at CVCU. Def.'s SUF ¶ 43. However, even presuming that the existence of the blind spots posed an unreasonable risk of harm upon the CVCU inmates, the facts do not lend themselves to a conclusion that Fowlkes responded unreasonably to such knowledge.

A supervisor's response (or non-response) satisfies the second element of § 1983 supervisory liability when it amounts to either total "inaction" or is so inadequate that it demonstrates "deliberate indifference to or tacit authorization of the alleged offensive practices." *Shaw*, 13 F.3d at 799.

Here, Fowlkes's response to the camera blind spots did not amount to total inaction. Upon discovering the blind spots, Fowlkes submitted a request for more cameras and promulgated a number of preventative policies, which required that:

> whenever inmates were present, an officer was to be stationed in the areas of the prison that lacked camera coverage, including the hallway outside of the laundry area in the basement. . . . CVCU employees [we]re directed not to spend unnecessary time with an offender of opposite sex when out of range of camera. And, unless there was an emergency, male officers were not allowed to enter inmate bathrooms or shower areas when those areas were occupied by inmates. Even when clearing those areas during rounds, male officers had to make a verbal announcement prior to entering.

Def.'s SUF ¶ 45. These polices were also verbally conveyed to CVCU employees at the beginning of every shift. *Id.* ¶ 47.

Fowlkes's fulsome and consistently reinforced preventative polices strike the Court as highly proactive, far from the sort of half-hearted, plainly ineffective, or uncritical action which would demonstrate deliberate indifference. *See, e.g.*, *Cox*, 828 F.3d at 303 (affirming a denial of summary judgment on a deliberate indifference claim where correctional officers disregarded supervisor's advice and confronted inmates who were threatening the plaintiff, putting the plaintiff

28

at greater risk); *Whitt v. Yancey*, 2015 WL 3456600, at \*6 (E.D. Va. May 29, 2015) (holding that an inmate had plausibly alleged deliberate indifference by prison officials as to the risk of her sexual assault by a unit counselor where prison officials knew that the counselor held the plaintiff in his office for multiple hours at a time, in violation of prison rules, and only required that the inmate "stick her hand out" of the office to check on her).

Absent actually increasing the coverage of the surveillance cameras, which Fowlkes could not do without VDOC granting her request, promulgating and enforcing policies such as those described above appears to be the most reasonable solution to the problem. Thus, this theory of liability fails on the second element of § 1983 supervisor liability.

Paradoxically, Plaintiff asserts that Okoli acted with Fowlkes's tacit authorization when he exploited the lack of surveillance cameras in the showers and assaulted Plaintiff, but she does not dispute the substance of Fowlkes's promulgated policies, which directly prohibited Okoli's presence in the showers. Mem. Opp'n 4–5, 9. Fowlkes could not have "authorized" conduct which she forbade. Rather, Okoli's conduct is precisely the kind of "deliberate criminal act[] of [a] properly trained employee" that, absent specific reason to anticipate, cannot be attributed to a supervisor. *Slakan*, 737 F.2d at 372–373. For this same reason, Plaintiff's case fails to satisfy the third element of § 1983 supervisor liability, since Fowlkes's response neither factually nor proximately caused Okoli's assault on Plaintiff. *See Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (explaining that a supervisor causes a constitutional injury where his "policy commands the injury of which the plaintiff complains" or where the constitutional injury constituted "the natural consequences of his actions.").

Thus, the undisputed record before the Court demonstrates that § 1983 supervisory liability does not attach to Fowlkes for her failure to correct the camera blind spots.

### b. *Direct Eighth Amendment Liability*

For many of the same reasons, Fowlkes's failure to correct the camera blind spots did not directly violate Plaintiff's Eighth Amendment rights. As previously explained, a prison official directly violates the Eighth Amendment when the evidence demonstrates that: (1) the complained-of injury was an objectively serious deprivation of Plaintiff's rights; (2) the prison official had actual knowledge of an excessive risk of such injury; and (3) the prison official responded in a patently inadequate manner. *Cox*, 828 F.3d at 237; *Danser*, 772 F.3d at 347; *Farmer*, 511 U.S. at 834.

Again, the Court notes that the relevant injury—Okoli's exploitation of the camera blind spots to sexually assault Plaintiff—is, necessarily, an objectively serious violation of Plaintiff's rights. *Woodford*, 548 U.S. at 118; *Jackson v. Holley*, 666 F. App'x 242, 244 (4th Cir. 2016); *Bearchild*, 947 F.3d at 1143. However, without deciding if the presence of the camera blind spots by themselves created an "excessive risk" of sexual assault, *Danser*, 772 F.3d at 347, the Court finds that this theory fails because Defendant Fowlkes's response was not patently inadequate.

Critically here, a prison official satisfies the demands of the Eighth Amendment when she responds reasonably to a perceived risk of harm, "even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. The Court's previous conclusion as to the reasonableness of Fowlkes's actions carries over here—the Court cannot say that Fowlkes's promulgation of policies preventing all unnecessary time spent in the blind spots is patently inadequate to address their danger. *See, e.g.*, *Cox*, 828 F.3d at 303; *Whitt*, 2015 WL 3456600, at *6. Without the final element of direct Eighth Amendment liability, this claim also fails.

3. <u>Failure to Train as to PREA Requirements</u>

Finally, Plaintiff's Complaint alleges that Defendant Fowlkes violated Plaintiff's rights by failing to "ensure that officers were properly trained to handle disclosures of sexual assault and harassment based on [PREA] guidelines" which led to the initial mishandling of Plaintiff's complaint regarding her assault. Compl. ¶ 71; Mem. Opp'n 10–11. Defendant Fowlkes argues that the record fails to demonstrate a specific inadequacy in the CVCU PREA training. Def.'s Mem. Supp. 26. In response, Plaintiff asserts that such inadequacy is made clear by Officer Ross's failure to advance Plaintiff's report. Mem. Opp'n 11. Again, however, the Court agrees with Defendant Fowlkes.

    *a. Section 1983 Supervisory Liability*

To succeed under a failure to train theory by way of § 1983 supervisory liability, a plaintiff must demonstrate that:

> (1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates[,] thus illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights.

*Brown v. Mitchell*, 308 F. Supp. 2d 682, 701–02 (E.D. Va. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

The Court presumes without deciding that the mishandling of Plaintiff's complaint constituted a violation of her constitutional rights.[16] Even still, Plaintiff's claim against Fowlkes again fails on the second element. A supervisor's failure to train employees incurs § 1983

---

[16] There is reason to believe, however, that it was not. Plaintiff chiefly complains of a violation of PREA, not the Constitution. *J.K.J v. Polk Cnty.*, 960 F.3d 367, 385 (7th Cir. 2020) ("PREA is not a constitutional standard, and jails are not required to adopt it. Our federal structure leaves the choices to state and local authorities."). Violations of PREA alone are not actionable under § 1983. *E.g.*, *Bracy v. Tully*, 2022 WL 3229325, at *3 (E.D. Va. Aug. 10, 2022) ("[T]here is no basis in law for a private cause of action under § 1983 to enforce a PREA violation." (citation omitted)).

supervisory liability only where the allegedly inadequate training demonstrates a "deliberate indifference" to the rights of those individuals with whom subordinates will come into contact. *Id.* at 702–03; *Harris*, 489 U.S. at 389. Such indifference in the failure to train context can generally be evidenced in one of two ways. First, a plaintiff may demonstrate that the "supervisory power [wa]s actually aware of the fact that its subordinates are regularly violating constitutional or statutory rights [but] fails to implement a training program to quell this pattern." *Brown*, 308 F. Supp. 2d at 703 (first citing *Harris*, 489 U.S. at 397, and then citing *Lytle v. Doyle*, 326 F.3d 463, 474 (4th Cir. 2003)). Alternatively, a plaintiff may demonstrate deliberate indifference based on a failure to train subordinates on "a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Id.* at 706 (quoting *Harris*, 489 U.S. at 396). "No matter which theory is alleged, the plaintiff must point out 'a specific deficiency' in training, 'rather than general laxness or ineffectiveness in training.'" *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020) (quoting *Spell v. McDaniel*, 824 F. 2d 1380, 1390 (4th Cir. 1987)).[17]

Here, the undisputed record reveals no such deficiency. The record before the Court demonstrates that all CVCU staff members received upon hiring comprehensive training regarding their PREA obligations, which was refreshed each year by "annual, mandatory in-service training." Def.'s SUF ¶ 22. This training emphasized the obligation of prison staff to detect, prevent, and report "known and suspected instances of sexual misconduct" and advised that "any staff members who fail to report violations may also be subjected to adverse employment action, up to and including termination of their employment." Def.'s SUF ¶ 34. For instance, the 2020 in-service curriculum advised attendees that "[a]ll staff, contractors and volunteers are required to report any

---

[17] While *Washington* and *Spell* both consider § 1983 claims against municipalities pursuant to *Monell*, supervisory liability for failure to train subordinates "is merely a more specific formulation of the *Monell . . .* inquiry." *Brown*, 308 F. Supp. 2d at 703.

suspicion of fraternization or sexual behavior between contractors, volunteers, and offenders. Staff are not only required to report, but also may be subjected to [adverse] action if they do not." Fowlkes Aff. Ex. F at 3, ECF No. 36-1 at 74–125. VDOC employees could report actual or suspected sexual misconduct "verbally, in writing, or through the established reporting hotline." Fowlkes Aff. ¶ 31.

The record does not reveal any particular deficiency in CVCU's training program, nor does Plaintiff highlight one. Mem. Opp'n 11. Rather, Plaintiff insists that the inadequacy of the program is made plain by the facts of the instant case, i.e., Officer Ross's undisputed mishandling of Plaintiff's initial complaint. *Id.* However, an isolated instance of a subordinate failing to abide by training procedures can hardly be construed as evidence of the *supervisor's* deliberate indifference. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . [A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). And, the record provides no reason to believe that Officer Ross's failure was part of a pattern of unreported complaints of which Fowlkes might have been aware. *See* Mem. Opp'n 10 (listing only Officer Ross's failure as an example of the ineffectiveness of the CVCU PREA training).

Because the record before the Court lacks any evidence to support a reasonable finding that CVCU's PREA reporting training program was inadequate, this claim against Fowlkes also fails.

### b. Direct Eighth Amendment Liability

As the Court has articulated twice before, a prison official only violates an inmate's rights for deliberate indifference where the prison official had *actual knowledge* of an excessive risk of constitutional injury. *Farmer*, 511 U.S. at 834. Presuming again that Officer Ross's failure to

advance Plaintiff's report constituted the kind of serious deprivation of rights contemplated by the Eighth Amendment, *Danser*, 772 F.3d 340, 346–47, the Court nevertheless finds that the undisputed record wholly lacks any indication that Fowlkes had reason to believe—much less actual knowledge of any fact—that one of her subordinates would fail to comply with his PREA reporting obligations. As detailed in the previous section, Fowlkes implemented a robust training program which required all CVCU staff to annually review their reporting requirements. Def.'s SUF ¶ 22. Further, the record provides no evidence that Fowlkes was aware of any other incidents where an officer failed to advance an inmate's report of sexual assault. *See generally id.* Without such evidence, this claim also fails against Fowlkes.

As a result of the foregoing, the Court finds that there is no genuine dispute of material fact which would require submission to a jury. Further, because the undisputed record demonstrates that Defendant Fowlkes is entitled to judgment as a matter of law on all ascertainable theories of § 1983 Eighth Amendment liability, the Court will grant Defendant Fowlkes's Motion for Summary Judgment as to Count Three.

## IV. CONCLUSION

Because Count Two fails to state a claim and Defendant Fowlkes is entitled to judgment as a matter of law on Count Three, the Court will grant the Defendant Fowlkes's Motion for Summary Judgment. An appropriate Order will accompany this Memorandum Opinion.

Date: <u>June 30, 2025</u>

Richmond, Virginia

_____ /s/

Roderick C. Young

United States District Judge